IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TEXARKANA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>CLIFTON PAPE<br>SALLY JUNG | Case No. 5:21-MJ-_7_ |

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, William R. Mack, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION

1.      I make this affidavit in support of a criminal complaint charging CLIFTON PAPE and SALLY JUNG (the "DEFENDANTS") with a violation of 18 U.S.C. § 1031, major fraud against the United States.

2.      I am currently a Resident Agent in Charge with the U.S. Secret Service, and I have been employed with the U.S. Secret Service since 2002. My duties as a Resident Agent in Charge include participating in and supervising investigations involving counterfeit (CFT) U.S. Federal Reserve Notes (FRNs), wire fraud, bank fraud, computer fraud and money laundering. I completed training at the Federal Law Enforcement Training Center in Brunswick,

Georgia, and the U.S. Secret Service training center in Beltsville, Maryland. I am a law enforcement officer as that term is used in Federal Rule of Criminal Procedure 41, and I am currently assigned to the Tyler, Texas Resident Office. My duties include investigating violations of 18 U.S.C. § 1343 (Wire Fraud) and 18 U.S.C. §§ 1956 and 1957 (Money Laundering). I am familiar with the information contained in this Affidavit based upon the investigation I have conducted.

3.     The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and does not set forth all of my knowledge about this matter.

4.     Based on my training and experience and the facts set forth in this affidavit, there is probable cause to believe that the DEFENDANTS have violated 18 U.S.C. § 1031.

## PROBABLE CAUSE

*My Buddy Loans charged Kelly and Sam Johnson to file fraudulent EIDL applications.*

5.     On July 17, 2020, a bank in the Eastern District of Texas ("BANK 1") reported possible illicit activity to the U.S. Secret Service (Secret Service) regarding bank customers, Cooperating Individuals 1 (CI-1) and 2 (CI-

2), who are residents of the Texarkana Division of the Eastern District of Texas. This report described the receipt of an Economic Injury Disaster Loan (EIDL) advance into a joint bank account owned by CI-1 and CI-2.[1]

6.     The EIDL program is also overseen by the United States Small Business Administration ("SBA"), which has authority over all such loans. According to the SBA, EIDL loans are processed outside the state of Texas. According to the SBA website (www.sba.gov), the stated purpose of an EIDL loan is "[t]o meet financial obligations and operating expenses that could have been met had the disaster not occurred." According to the SBA website, the EIDL loan "Use of Proceeds" is for "Working capital and normal operating expenses." Cited examples of EIDL Use of Proceeds were, "Continuation of health care benefits, rent, utilities, fixed debt payments." EIDL loans are low interest loans and are not forgivable.

---

[1] The Coronavirus Aid, Relief, and Economic Security ("CARES") Act was a federal law enacted in March 2020 and designed to provide emergency financial assistance to the millions of Americans who are suffering the economic effects caused by the COVID-19 pandemic. One source of relief provided by the CARES Act was the EIDL program, which was designed to provide assistance to businesses suffering temporary loss of revenue resulting from the pandemic.

7.      Under the EIDL Advance program, however, loan applicants were eligible for an advance of up to $10,000 if the applicant had ten or more employees, which was forgivable. The advance amount was based on the number of employees reported by a business. An applicant could receive $1000 per employee up to $10,000, which was the maximum amount available. The SBA required an EIDL Advance applicant to provide specific information at the time the application was made, including the number of employees, revenue, and cost of goods. An EIDL applicant could apply through a third-party processor. Third-party processors were permitted to charge a reasonable fee for their services.

8.      On August 5, 2020, I reviewed bank records that indicated that CI-1 and CI-2's joint account received an EIDL deposit of $10,000. These funds were then transferred into an account owned solely by CI-1 at BANK 1, an account in which an EIDL deposit had previously been made.

9.      On August 6, 2020, I interviewed CI-1 via telephone, who provided the following information: CI-1 heard from a friend that a company called "BUDDY LOANS" could help people get an agricultural loan. An acquaintance gave a phone number to contact for BUDDY LOANS. CI-1 contacted BUDDY LOANS at 832-599-2568 ("PHONE NUMBER 1") and initially left a message. Then someone returned the call several days later. On that call, CI-1 provided

CI-1's personal information as well as CI-2's personal information for two separate loan applications for which CI-1 paid about $1083 per application using a Chase Visa credit card. CI-1 did not supply any business information to BUDDY LOANS for these applications. Shortly thereafter, CI-1 received emails from BUDDY LOANS. About two weeks before I spoke with CI-1, CI-1 called BUDDY LOANS regarding the loan applications. An individual at BUDDY LOANS indicated that CI-1 would receive the funds in thirty to sixty days.

10.   On August 20, 2020, I interviewed CI-1 in-person. During the interview, CI-1 reiterated several prior statements. CI-1 produced paperwork associated with the loan application, including the following items:

    a.   A "Service Agreement" between CI-1 and "My BUDDY LOANS" (MBL) that was digitally signed by CI-1 and Jim Smith on behalf of MBL and was dated July 7, 2020.

    b.   An invoice for $1082.50 ($1000 plus tax) reflecting payment from CI-1 to MBL, 510 Bering Dr., Houston, Texas, 77057, which was digitally signed by CI-1. The invoice included the following: "contact Jim Smith by phone at [PHONE NUMBER 1]."

c.    A "screen shot" from a credit card account ending in 4774 indicating two charges by MBL (via Square) for $1082.50.

d.    A photograph of a form with several fields for personally identifiable information ("PII") such as date of birth. These fields do not include number of employees, revenue, or cost of goods. In the field for "Company Name," the words "if business" are handwritten on the form. CI-1 sent this photo via text message to my Secret Service-issued iPhone.

11.    CI-1 forwarded an email to my Secret Service email account that was sent to CI-1 from the electronic document manager DocuSign, which contained a link to the completed Service Agreement between CI-1 and MBL. In addition, CI-1 told me the following: In late June 2020, CI-1 called and spoke to a female named Heather, which I now believe is an alias used by JUNG, to make an appointment. CI-1 later spoke to "CLIFF" to submit the application. CI-1 received a text message with a form that CI-1 completed. CI-1 spoke to CLIFF on July 7, 2020, who told CI-1 he would help "get [CI-1] the money." CI-1 told CLIFF that CI-1 already received a loan. CI-1 was instructed to digitally sign and email the form back to CLIFF with a copy of CI-1's driver license and credit card. CI-1 anticipated receiving the loan in thirty to sixty days. CLIFF told CI-1 that some individuals receive their loans in forty-eight hours, but for

others it takes thirty to sixty days. CI-2 received a loan in about forty-eight hours. According to CI-1, the money was intended to be used to maintain CI-1's property and CI-2's property. CI-1 indicated that no business is conducted at these properties. CLIFF did not ask for, nor did CI-1 report, a business name or EIN, number of employees, business revenues, or costs of goods sold; CI-1 provided only personal information, including social security numbers.

12.     After the interview, CI-1 provided a Visa credit card number ending in 4774, which was used to pay for the loans.

13.     According to Verizon records, PAPE, using an address on County Road 318 in Cleveland, Liberty County, Texas, 77327 (the "SUBJECT PREMISES"), was the subscriber of PHONE NUMBER 1 from March 20, 2020, to August 11, 2020, which includes the time CI-1 received the call from this number from MBL. Then, on August 11, 2020, SALLY JUNG became the subscriber for PHONE NUMBER 1, also using the address of the SUBJECT PREMISES.

14.     According to records from Square, the account through which CI-1 paid MBL $1082.50 (the "SQUARE ACCOUNT") was created by JUNG using the address of the SUBJECT PREMISES with the business name of MBL. CI-1's Visa credit card ending in 4774 was charged $1082.50 twice on July 7, 2020, once for CI-2 and once for CI-1's daughter.

*My Buddy Loans is using IP addresses assigned to the SUBJECT PREMISES.*

15.     The SBA Office of the Inspector General (SBA-OIG) obtained and reviewed CI-2's EIDL application that was submitted on July 7, 2020. According to the SBA, this application was submitted from Internet Protocol (IP) address 24.72.162.170 the ("IP ADDRESS 1"). SBA-OIG subsequently queried all EIDL applications from this IP address and discovered that 223 individual EIDL applications were submitted to the SBA from IP ADDRESS 1.

16.     A review of the EIDL applications submitted from IP ADDRESS 1 indicated the following: Both CI-1's and CI-2's EIDL applications were submitted from IP ADDRESS 1 within minutes of each other, thereby validating CI-1's statements. All EIDL applications submitted from IP ADDRESS 1 indicated the same number of employees, ten, which is the minimum number required to receive the maximum EIDL advance of $10,000. All EIDL applications reported an amount for cost of goods sold and all except one reported a figure for gross revenues.

17.     A review of EIDL applications submitted from IP ADDRESS 1 also indicates that both CI-1's and CI-2's EIDL applications included their names, dates of birth, and social security numbers.

18.     IP ADDRESS 1 was subsequently found to be hosted by NewWave Communications which is owned by Cable One, Inc. (Cable One). Cable One's records indicate that IP ADDRESS 1 was assigned to the SUBJECT PREMISES for several months of 2020; PAPE was identified as the subscriber. Cable One's records also indicate that Cable One assigned IP ADDRESS 2, specifically 66.235.82.208, to the SUBJECT PREMISES with PAPE as the subscriber for the period of September 3, 2020, through October 6, 2020.

19.     A review of EIDL applications revealed that a total of 240 applications were submitted from IP ADDRESSES 1 and 2, including one application using PAPE's name and the address of the SUBJECT PREMISES. In 222 of those applications, the number of employees reported is 10. From those 222 applications, 130 EIDL advances were issued for exactly $10,000.00—$1000 per employee—the maximum advance allowed. In total, $1.3 million was paid on the basis of these 130 EIDL applications, which were all submitted from IP ADDRESS 1 during the one and half months that it was assigned to the SUBJECT PREMISES.

*Fraud proceeds were obtained through the SQUARE ACCOUNT and moved to the BANK ACCOUNT at Wells Fargo.*

20.     According to Square's records, the SQUARE ACCOUNT has made approximately 1053 charges or attempted charges all in the amount of

$1082.50 to numerous payment cards between June 10, 2020, and November 13, 2020. Of those charges, at least 716 were successful for a minimum total of approximately $775,070. Approximately 337 charges were unsuccessful. At least twenty-five charges originated from IP ADDRESSES 1 and 2. The SQUARE ACCOUNT is linked to a bank account (the "BANK ACCOUNT") at a national bank. Since June 10, 2020, $681,404.03 has been transferred from the SQUARE ACCOUNT to the BANK ACCOUNT.

21.     Bank records show that the BANK ACCOUNT is a business checking account owned by JUNG under the business name of WORKING4U, INC., at 30 N. Gould Street, Suite 7732, Sheridan, Wyoming. The account was opened on May 21, 2018. The statement mailing address on the account is the address of the SUBJECT PREMISES. Records for the BANK ACCOUNT further indicate that SUBJECT PREMISES is JUNG's residence.

22.     According to public information available from the Wyoming Secretary of State, WORKING4U, INC. is registered in the State of Wyoming at the same address in Sheridan, Wyoming, as listed in records for the BANK ACCOUNT. JUNG is listed as the Secretary/Director of WORKING4U, INC. JUNG's address in the State of Wyoming records is 510 Bering Dr., Houston, Texas, 77057. This is the same address that appears on paperwork for MBL provided by CI-1 and others. The 2020 Profit Corporation Annual Report on

file with the Wyoming Secretary of State lists WORKING4U, INC.'s telephone number as PHONE NUMBER 1 and its email address as cliffpape@working4u.us.

*Other applications from My Buddy Loans*

23.     Cooperating Individual 3 ("CI-3"), a resident of the Eastern District of Texas, was identified in SBA records as an applicant for an EIDL advance loan from IP ADDRESS 1. On August 26, 2020, I interviewed CI-3 by phone, and CI-3 provided the following information: CI-3 applied for the loan after a friend referred CI-3 to MBL. CI-3 called PHONE NUMBER 1 and subsequently applied for an EIDL advance loan through MBL and paid MBL approximately $1082.50 for processing the application. CI-3 initially called MBL and left a message. CI-3 received a call back and eventually talked to a woman as well as an individual named "CLIFF." CI-3 later contacted SBA directly and learned that CI-3's loan was denied. CI-3 never received any funds from SBA, but the friend that referred CI-3 to MBL received $10,000 after he applied for an EIDL advance loan through MBL. According to SBA records, CI-3's EIDL advance application reported ten employees and $62,500 in revenues. CI-3 did not provide this information to MBL nor did MBL ask for it.

24.     Cooperating Individual 4 ("CI-4"), a resident of the Texarkana Division of the Eastern District of Texas, is listed in SBA records as an

applicant for an EIDL advance loan from IP ADDRESS 1. According to SBA records, CI-4's EIDL advance application reported ten employees and $68,000 in revenues. On September 18, 2020, I interviewed CI-4 and CI-4's spouse ("CI-5"). CI-5 provided the following information: CI-5 heard about MY BUDDY LOANS while attending a family gathering. CI-5 eventually called MY BUDDY LOANS and provided PII, CI-5's driver's license, and a credit card. CI-5 sent the driver's license and credit card information electronically to PHONE NUMBER 1 and paid a fee of $1000 plus tax. Shortly thereafter, CI-5 received an email from DocuSign. CI-5 never reported having ten employees or any information regarding revenues or costs of goods to MY BUDDY LOANS. CI-4 received a $10,000 EIDL advance. On September 12, 2020, CI-5 received a text message from telephone number 832-401-4290 ("PHONE NUMBER 2") stating the following: "We now have $10,000 grants for agriculture, 1 or more acres required. Do you know anyone that needs one? Text remove to quit." According to Verizon records, the subscriber of PHONE NUMBER 2 at the time CI-5 received the text message was a business customer named ANAUTRA LLC and the contact person was JUNG. The address on file with Verizon for this subscriber was the SUBJECT PREMISES. According to Verizon records, as of September 22, 2020, PHONE NUMBER 2 was registered to business customer BUDDY LOANS, also at the SUBJECT PREMISES.

25.     Following this interview, CI-5 forwarded multiple emails to a Secret Service email address including an email that CI-5 received from Square (invoicing@messaging.squareup.com) to pay an invoice of $1000 plus tax of $82.50 to MY BUDDY LOANS.

26.     Cooperating Individual 6 ("CI-6"), a resident of the Eastern District of Texas, is listed in SBA records as an applicant for an EIDL advance loan from IP ADDRESS 1. According to SBA records, CI-6's EIDL advance application reported ten employees and $68,000 in revenues. An EIDL application was also submitted for a business owned by CI-6's spouse that reported ten employees and revenues of $75,000. On November 4, 2020, I interviewed CI-6 who provided the following information: CI-6 became aware that people could call a subject named "CLIFF" and obtain a $10,000 "grant" from the government. In exchange for ten percent of this grant, "CLIFF" would assist with the application. The applicant was required to own three acres of land or a business. CI-6 learned about "CLIFF" from someone in the Eastern District of Texas who was telling others about "CLIFF" and MBL. CI-6 eventually called MBL. MBL required that CI-6 prepay ten percent of the grant via credit card for completing the paperwork; CI-6 paid using a Discover card. CI-6 submitted two applications. One application was in CI-6's spouse's name for a business that has no employees and that had revenue of about $15,000 to

$20,000 in 2019. The second application was for CI-6's property of eight acres in the Eastern District of Texas. CI-6's spouse received a $10,000 grant within a few days, and a subsequent loan for $1500. CI-6 did not receive a $10,000 grant for the eight-acre property. CI-6 does not recall supplying information about revenues or cost of goods to MBL. CI-6 recalled that "CLIFF" told CI-6 that CI-6 qualified for three total loans since CI-6 also owned a thirty acre property separate from the eight acre property.

27.    CI-6 provided documentation consistent with other MBL applicants including three Square invoices for payments to MBL, which includes two payments of $1082.50 and one payment of $32.48. CI-6 also provided emails from DocuSign related to the EIDL applications submitted through MBL.

*Agents conducted a controlled buy.*

28.    On August 31, 2020, Cooperating Individual 7 ("CI-7") working at the direction of special agents of the Secret Service contacted MBL at PHONE NUMBER 1 seeking to apply for an agriculture grant. CI-7 left a message and then received a return call from telephone number 832-302-7593 ("PHONE NUMBER 3"), which resulted in a voicemail from "Ryan" who said he was returning a call about interest in a $10,000 agriculture grant. CI-7 then called PHONE NUMBER 3 and was told that CI-7 must have at least one acre of land

owned before 2020 and a physical address. CI-7 was also told that a fee of $1082 was due at the time of "the appointment." CI-7 agreed and was told that someone would call.

29.     A female, who later identified herself as MICHELLE LESTER, contacted CI-7 from telephone number 832-401-4237 ("PHONE NUMBER 4") and left a voicemail message in which she said she was calling for an appointment. CI-7 returned this call and spoke to LESTER who asked a series of questions and requested personally identifying information and information about the land CI-7 purported to own. LESTER solicited a fee of $1082.50. CI-7 provided information for an undercover persona, including a bank account and email address, to LESTER. During the call, an email was received in the undercover email account CI-7 provided to LESTER from the email address invoicing@messaging.squareup.com. CI-7 then paid the fee of $1082.50 with an undercover debit card in the name of an undercover persona via the link provided in the email from Square.

30.     According to Verizon records, the subscriber for PHONE NUMBERS 3 and 4 is SALLY JUNG under business name Working4U, Inc. Prior to JUNG, the subscriber of these numbers was PAPE under the business name BU Holdings LLC.

31.     SBA-OIG has made multiple searches for an EIDL advance application submitted with the information that the undercover persona supplied to LESTER. No applications have been found in SBA records. A successful charge was made to the undercover debit card for $1082.50. Square records also indicate a $1082.50 charge was made to this debit card. The bank account provided to LESTER has no record of any deposit of any amount related to this call.

<i>Other participants at the SUBJECT PREMISES</i>

32.     A search warrant was served on Google, Inc. for accounts associated with PAPE. During an ongoing review of the account, photographs have been found that appear to depict scenes inside the residence located at the SUBJECT PREMISES. These photographs include the following:

a.  A photograph (PHOTOGRAPH 1) depicting a gathering of persons around a counter in front of a window. The view out of the window is of a structure past a fence that appears to be an adjacent property. A review of open source satellite images indicates this view is of the property immediately to the east of the SUBJECT PREMISES indicating that PHOTOGRAPH 1 was taken inside the SUBJECT PREMISES.

b.  Another photograph (PHOTOGRAPH 2) depicts the counter shown in PHOTOGRAPH 1 but from a greater distance that shows a larger room with at least three small, partitioned areas.

c.  Another photograph (PHOTOGRAPH 3) depicts a male subject, who also appears in PHOTOGRAPH 1, who is sitting at a small desk behind a partitioned area. This partitioned area appears to be one of the areas depicted in PHOTOGRAPH 2 indicating it was taken inside the SUBJECT PREMISES. Various papers, file folders, and a binder are seen on this desk. The subject is holding one cell phone, and another cell phone is visible on the desk.

d.  Another photograph, (PHOTOGRAPH 4) depicts a different male subject sitting at a small desk in a partitioned area. This partitioned area does not appear to be the one depicted in PHOTOGRAPH 2. Visible on the desk are three cell phones, a laptop computer, a monitor, file folders, and a notebook. In addition, various sheets of paper bearing illegible writing are affixed to the walls within the partitioned area. The subject is also seen in PHOTOGRAPH 1.

33.  Bank records show that checks have been written from the BANK ACCOUNT to various people with handwritten memos that indicate payroll

disbursements including the phrase "pay period" or "workweek" with a range of dates in 2020. Many checks have only a date range.

34.     Subject 1 ("S-1") is a payee of eight checks from the BANK ACCOUNT, which are detailed here:

| Check # | Dates on memo line | Amount |
|---------|--------------------|--------|
| 1238 | 8/3-8/8/20 | $216.00 |
| 1245 | 8/10-8/16/20 | $543.00 |
| 1251 | 8/17-8/22/20 | $690.00 |
| 1267 | 8/24-8/30/20 | $538.86 |
| 1273 | 8/31-9/5/20 | $468.48 |
| 1160 | 9/7-9/13/20 | $340.20 |
| 1302 | 9/14-9/20/20 | $96.00 |
| 1317 | 9/21-9/27/20 | $390.00 |

35.     In addition, records for the BANK ACCOUNT include check number 1271 made payable to Subject 2 ("S-2"). This check also includes a handwritten memo consistent with others that appear to be payroll disbursements, specifically "8/31 to 9/5/20." The back of this check is double endorsed by S-2 and S-1. Two eight-digit numbers are written on the back of check 1271, which appear to be the Texas driver license numbers assigned to S-2 and S-1. S-2's and S-1's Texas driver license photos were compared to PHOTOGRAPHS 1 and 4. S-1 appears to be depicted in PHOTOGRAPHS 1 and 4. S-2 appears to be depicted in PHOTOGRAPH 1.

36.     Several checks were written to Subject 3 ("S-3") from the BANK ACCOUNT in a manner consistent with those made payable to S-2 and S-1.

The first check made payable to S-3 is check number 1154 with memo "9/7 to 9/13/20" for the amount of $168.00. Based on S-3's Texas driver license photo, S-3 appears to be depicted in PHOTOGRAPH 1 along with S-2 and S-1.

*PAPE and JUNG are spending the proceeds*

37.     Google records revealed a photograph of a traffic ticket issued by the City of Cut and Shoot, Texas, to PAPE on June 5, 2020. On July 28, 2020, the user of the Google account associated with PAPE searched Google Maps for "3355 Court at 5 PM 14391 TX-105 E, Cut and Shoot, TX 77306." An open source search reveals that 14391 TX-105 E, Cut and Shoot, Texas 77306 is the Cut and Shoot, Texas, City Hall. In addition, records for the BANK ACCOUNT reveal that a charge of $177.00 to the City of Cut and Shoot was made to a debit card associated with the BANK ACCOUNT on July 28, 2020.

38.     Examination of records for the BANK ACCOUNT indicate that a charge was made from that account on September 19, 2020, for $78.50 for "Houston Karting Comp Conroe TX". On the same day, the user of the Google account associated with PAPE searched Google Maps for "Houston Karting Complex, 3528 S Loop 336 E, Conroe, TX 77301." An open source search confirmed that Houston Karting Complex is at this address.

39.     Examination of records for the BANK ACCOUNT indicate that a charge was made from that account on August 4, 2020, for $3696.77 for "La

Cantera Resort San Antonio TX". Google records associated with PAPE contained a photograph that was created on August 1, 2020:



This photograph appears to depict PAPE on the right and JUNG on the left. In the photograph, both PAPE and JUNG are wearing pink bracelets marked "La Cantera."

*Takedown*

40.     On January 12, 2021, pursuant to warrants from this Court, agents searched the SUBJECT PREMISES and seized $505,535.04 from the

BANK ACCOUT. PAPE and JUNG were at the SUBJECT PREMISES. With them, agents found S-3, Subject 4 ("S-4"), who I believe was the woman who had identified herself as LESTER during the phone call with CI-7, Subject 5 ("S-5"), and one minor child. Inside, agents discovered numerous cell phones, computers, and SBA documentation. On that day, agents spoke with several cooperating individuals. The cooperating individuals made statements consistent with the facts described above, including that PAPE and JUNG owned and were in charge of the operation, that PAPE and JUNG had hired others to speak to third-parties over the phone and solicit payment in exchange for filing an application for a $10,000 federal grant, and that PAPE or JUNG file the applications with the federal government.

## CONCLUSION

41.    Based on this affidavit, there is probable cause to believe that beginning in or before June 2020 and continuing through the date of this affidavit, the United States awarded EIDL advances, the value of said advances being in excess of $1,000,000.

## THE SCHEME AND ARTIFICE

42.    Beginning in or before June 2020 and continuing through the date of this affidavit, in connection with the foregoing EIDL advances, the defendants, CLIFTON PAPE and SALLY JUNG, devised a scheme and artifice

to defraud the United States and to obtain money or property by means of false and fraudulent pretenses and representations.

43.    It was part of the scheme and artifice to defraud the United States and to obtain money or property by means of false and fraudulent pretenses and representations, that the defendants did the following:

   a.  The defendants falsely represented to third parties that a $10,000.00 agricultural grant was available from the United States government.

   b.  The defendants submited EIDL loan applications in the names of third parties that contained false information, including the number of employees.

   c.  The defendants, in exchange for submitting the false EIDL loan applications, charged third parties at least $1000.00 via a credit or debit card processed through Square.

EXECUTION OF THE SCHEME AND ARTIFICE

44.    Beginning in or before June 2020 and continuing through the date of this affidavit, within the Eastern District of Texas and elsewhere, the defendants, CLIFTON PAPE and SALLY JUNG, knowingly executed the scheme and artifice with the intent to defraud the United States and to obtain

money or property by means of false and fraudulent pretenses and representations.

All in violation of 18 U.S.C. § 1031.

> Respectfully submitted,
>
> *Appearing by phone*
> WILLIAM R. MACK
> Special Agent
> U.S. Secret Service

Subscribed and sworn to before me on __January 12, 2021__ by reliable electronic means under rule 4.1 of the Federal Rules of Criminal Procedure.

CAROLINE M. CRAVEN
UNITED STATES MAGISTRATE JUDGE